UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

Leonard C. Norwood,                                    Case No. 03-45080
                                                       Chapter 7
                        Debtor.                        Hon. Phillip J. Shefferly
_____/
Kenneth A. Nathan, Chapter 7 Trustee,
                Plaintiff,

v.                                                     Adv. No. 04-4979

Leonard C. Norwood and Anita Norwood,

                Defendants.
_____/

**TRIAL OPINION (i) DISMISSING ACTION UNDER
BANKRUPTCY CODE § 547; (ii) GRANTING JUDGMENT AGAINST
ANITA NORWOOD UNDER BANKRUPTCY CODE §§ 544, 548 AND 550;
AND (iii) DISMISSING COMPLAINT AGAINST LEONARD C. NORWOOD**

I.  Introduction

This matter is before the Court upon a complaint filed by the Chapter 7 Trustee seeking to recover

preferential transfers and to avoid fraudulent transfers.  Count I is brought under § 547 and § 550 of the

Bankruptcy Code and seeks the recovery of  preferential transfers alleged to have been made by the

Debtor, Leonard Norwood, to his wife, Anita Norwood.  Count II is brought under Bankruptcy Code

§§ 548 and 550 and seeks the recovery of fraudulent transfers  alleged to have been made by the Debtor

to his wife.  Count III is brought under Bankruptcy Code § 544 and Mich. Comp. Laws Ann. §  566.31

et. seq. and seeks the recovery of fraudulent transfers alleged to have been made by the Debtor to his wife.

The Plaintiff seeks a money judgment against the Debtor and Anita Norwood, jointly and severally, and an order setting aside the alleged preferential transfers and fraudulent transfers. The Court entered a joint final pre-trial order on September 19, 2005. Trial of the adversary proceeding was held on September 21 and September 22, 2005. The Court heard testimony from the Debtor and Anita Norwood, and admitted into evidence Plaintiff's Exhibits A through U and Defendants' Exhibits 1 through 12. The Court has reviewed the testimony, exhibits, complaint, answer, trial briefs and the final pre-trial order. The following constitutes this Court's findings of facts and conclusions of law under Fed. R. Bankr. P. 7052. For the reasons set forth in this Opinion, the Court will enter a judgment in favor of Plaintiff and against Anita Norwood in the amount of $81,445.25 and dismiss the complaint against the Debtor.

## II. Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H).

## III. Facts

In 1997, the Debtor married Anita Norwood. The Debtor is a former professional hockey player. After retiring, the Debtor became involved in the ownership of two business entities that were formed for the purpose of developing a golf course and residential properties. The Golf Club of Michigan, LP ("Golf Club") is a Michigan limited partnership that owned and operated a golf course located in Livingston County, Michigan. The Debtor owned 32% of Golf Club. The balance of Golf Club was owned by Andrew Soley and John Yates. The LANS Development Corporation ("LANS") is a Michigan corporation that owned the residential property surrounding the golf course. The Debtor owned 50% of LANS and Soley owned the other 50%. In addition to owning an interest in LANS and Golf Club, the

Debtor was also an employee of Golf Club. The Debtor's responsibilities related primarily to marketing. Through the contacts that the Debtor had as a professional athlete, he helped to generate business for Golf Club. Until October, 2001, Golf Club paid the Debtor a salary of approximately $52,000 annually and made payments on the Debtor's Cadillac Escalade in the amount of $675 per month.

In connection with Golf Club's development of the golf course and the development of the residential property by LANS, the Debtor executed personal guarantees of certain business loans obtained by these entities. On March 18, 1999, the Debtor executed a guarantee (Exhibit G) of loans made by Bank One to LANS. On September 20, 2000, the Debtor executed a guarantee (Exhibit S) of a loan in the principal amount of $4,500,000 made by Textron Financial Corporation to Golf Club. On June 21, 2001, the Debtor executed a guarantee of an equipment lease agreement (Exhibit F) entered into by Golf Club and Great America Leasing Corporation.

By mid 2001, Golf Club was experiencing financial problems. Among other obligations, Golf Club was unable to pay its indebtedness to Textron. On August 21, 2001, Textron wrote to the Debtor (Exhibit U), in his individual capacity as a guarantor, to notify him of various defaults by Golf Club, including Golf Club's failure to make regularly scheduled payments of principal and interest with respect to Textron's note. In October, 2001, the Debtor volunteered to take himself off the payroll of Golf Club. The Debtor explained that this was due in part to the fact that Golf Club was struggling financially but was also due in part to the fact that the Debtor had experienced two personal injury accidents, which made it difficult for medical reasons for him to continue to work for Golf Club.

Sometime after Golf Club began experiencing financial difficulties, the Debtor was asked by Bank One to update his personal financial statement. On September 21, 2001, the Debtor and his wife filled out

and signed a confidential personal statement (Exhibit B). The financial statement indicates that it was prepared "joint w/Spouse." It showed assets of $1,320,000 and liabilities of $317,000. However, the Debtor testified that the financial statement was not accurate in a number of respects. First, the largest asset on the financial statement was "cash value of life insurance" worth $1,000,000. The Debtor testified that this sum was not actually the cash value but, instead, was the death benefit payable under the insurance policy and, therefore, was not an asset in the amount of $1,000,000. The Debtor also acknowledged that the asset consisting of "cash at other financial institutions" of $40,000 was inaccurate. The Debtor testified that, although these assets were overstated, he omitted other assets. The missing assets identified by the Debtor included the Debtor's interest in certain real estate, although the Debtor included some of the real estate in Schedule B, attached to the financial statement. Next, the Debtor pointed out that the financial statement did not list his interest in LANS, his interest in a time share, nor his interest in certain personal injury claims arising out of the accidents that he had suffered. In addition to the assets being inaccurate on the financial statement, the Debtor testified that he did not list some liabilities on this financial statement. The Debtor did not disclose any of his personal guarantees to Textron, Great America Leasing or Bank One on the financial statement, although he prepared and signed the financial statement on September 21, 2001, at a time when Golf Club was experiencing financial difficulties and one month after Textron had notified the Debtor of the defaults by Golf Club. The Debtor conceded during his testimony that if the Textron liability alone were added to this financial statement, it would have disclosed liabilities in excess of assets.

On December 13, 2001, Textron filed suit in Livingston County Circuit Court (Exhibit E) against Golf Club, the Debtor and the other guarantors of the Textron indebtedness. In its complaint, Textron

-4-

stated that the amount due and owing by Golf Club and by the Debtor as a guarantor was $3,349,962.61.

On January 15, 2002, DKW Law Group submitted a proposal (Exhibit I) to Textron. Although the proposal does not clearly state on whose behalf DKW was acting, DKW was representing Golf Club, the Debtor and Soley in the Textron litigation, and it appears from the Debtor's testimony that the proposal was made on behalf of Golf Club, the Debtor, and the other guarantors of the Textron indebtedness. The proposal indicated that LANS may be able to enter into a transaction regarding a sale of the residential property that could pay off the underlying land contract on the residential property at a discount, and could enable the owners of LANS to obtain funds to provide "a substantial infusion of capital" into the golf course operated by Golf Club. According to the Debtor, the proposed disbursement of proceeds of LANS was not something he had agreed to, nor was the proposal ever accepted by Textron.

While the Textron lawsuit was pending, and shortly after DKW made the proposal to Textron, another lawsuit was filed against Golf Club, the Debtor and the other guarantors. On February 1, 2002, Great America Leasing filed suit in the U.S. District Court for the Eastern District of Michigan (Exhibit F). In its complaint, Great America Leasing sought judgment against the Debtor, Golf Club, Solely and Yates, in the amount of $348,526.04.

Meanwhile, after his employment ceased with Golf Club in October, 2001, the Debtor no longer had a regular salary and, in addition, he was now required to make the monthly payments on his Cadillac Escalade. During this time, the Debtor did some part time work with Fox Sports and, eventually, in April, 2002 went to work for Loan Giant with a monthly salary of $1,400.00. However, in the months following October, 2001, when he no longer received a salary from Golf Club, the Debtor began taking cash advances from various credit card accounts to help pay his bills and other obligations that he and his wife

had. The Debtor's credit report from Equifax dated November 15, 2001 (Exhibit T) reflects that the Debtor had a number of credit cards during this time period which had outstanding balances at or near the maximum amounts permitted under each such card. During this time the Debtor and his wife maintained a joint checking account at Comerica Bank. A summary of the activity in that account (Exhibit P) prepared by the Debtor, as well as the monthly statements from that account (Exhibit Q), show that after October 1, 2001 there were no longer any deposits from salary that the Debtor obtained from Golf Club, but there were substantial deposits from time to time based upon cash advances obtained by the Debtor from his various credit card accounts. The Debtor took those cash advances to help pay for ongoing bills.

While the Textron and Great America Leasing lawsuits were pending, LANS did enter into a transaction to sell the residential property. The closing statement (Exhibit K) for the sale, dated February 22, 2002, reflects that after payoff of the underlying land contract, the "net due to seller" was $784,547.74. The Debtor testified that he did not use the sale proceeds in the manner that was proposed by DKW in Exhibit I. Instead, on February 22, 2002, the Debtor instructed Metro Title Company in writing (Exhibit L) to disburse two checks, each in the amount of $392,273.87, one to be paid to Soley and the other to be paid to the Debtor. The Debtor received a check dated February 22, 2002 in the amount of $392,273.87 reflecting his half of the net proceeds from the sale of the residential property of LANS (Exhibit M). On that same day, the Debtor made two deposits. The first deposit was $200,000 to the joint checking account that the Debtor and his wife maintained at Comerica Bank (Exhibit N). At the time of the deposit, the joint checking account contained a balance of $982.29 (Exhibit P). The second deposit (Exhibit N) was $187,273.87 made directly into a savings account that Anita Norwood had maintained at Comerica Bank since before she was married to the Debtor. The Debtor testified that Anita Norwood

-6-

either made this deposit or signed for it because the account was in her name. The record does not show what the balance was in that account at that time. The Debtor explained that he placed a portion of the funds that he received from the sale of residential property by LANS into Anita Norwood's account for "safe keeping" because he knew that he would have to pay the DKW bill, but did not know the amount that he would have to pay.

The funds placed in the joint checking account were to be used to pay bills. On the same day that the Debtor deposited the LANS sale proceeds, the Debtor took some of the funds in the joint checking account at Comerica Bank and made payments with respect to three obligations encumbering assets owned by the Debtor and his wife, and one obligation encumbering an asset owned solely by his wife. Exhibit P shows the following entries for withdrawals taken on February 22, 2002, the same day that the $200,000 deposit was made:

| Num | Date | Payee | Category | Amount |
|------|---------|----------|-------------------------------------|----------------|
| 1434 | 2/22/02 | Bank One | Transfer to: Bank One: Line of Credit | ($40,587.38) |
| 1435 | 2/22/02 | Bank One | Automobile: Harley Davidson | ($16,108.50) |
| 1437 | 2/22/02 | Bank One | Automobile: Mercedes Benz | ($27,011.68) |
| 1438 | 2/22/02 | Bank One | Automobile: BMW | ($28,707.07) |

(Exhibit P at 14.)

In the stipulation of facts contained in the joint final pre-trial order (docket #52), the parties stipulated to certain facts with respect to each of these four payments and stipulated to the amounts of the payments which in some instances were slightly different than reflected on the summary of the joint checking account activity prepared by the Debtor (Exhibit P). In the stipulation of facts, the parties agreed that the

-7-

first payment of $40,587.38 was paid "to Bank One by paying off a home equity loan owed jointly with Anita Norwood on jointly owned real estate." The parties agreed that the second payment was actually paid in the amount of "$15,754.74 to Bank One by paying off the loan balance on a joint debt on a Harley Davidson motorcycle owned jointly with Anita Norwood." The parties agreed that the third payment was actually paid in the amount of "$26,484.55 to Bank One by paying off the loan balance on a joint debt with Anita Norwood . . . on a 1995 Mercedes Benz . . . owned jointly with her." The parties agreed that the fourth payment was actually paid in the amount of $28,703.04 "to payoff the loan balance on her 1998 BMW M Roadster." The four payments that the Debtor made out of the joint checking account on February 22, 2002 from the deposit of the sale proceeds from LANS made by the Debtor on the same date totaled $111,529.71. Out of that sum, $82,826.67 went to pay the three jointly owed debts encumbering jointly owned property and $28,703.04 went to pay off a debt of the Debtor that encumbered an asset owned solely by Anita Norwood. Exhibits 6, 7, 8 and 10 evidence the payments themselves. Both the Debtor and his wife testified that Anita Norwood did not give or promise anything of value to or for the Debtor in exchange for making these payments. The Debtor testified that these payments were not regularly scheduled payments, but instead represented the unpaid balances owing with respect to each of these four obligations.

Shortly after the Debtor deposited the sale proceeds into the joint checking account and into Anita Norwood's savings account, another lawsuit was filed against Golf Club, the Debtor and others. This lawsuit was filed by DKW, the law firm representing Golf Club, the Debtor and the other guarantors in connection with the Textron litigation, the Great America Leasing litigation and other matters. DKW filed this lawsuit on February 26, 2002 (Exhibit J) and sought the recovery of legal fees allegedly owed by Golf

-8-

Club and each of certain individuals to DKW. DKW had requested that $300,000 of the proceeds from the sale of LANS be paid to it on account of its outstanding legal fees. When the payment was not made, DKW commenced suit. The Debtor settled the claims of DKW against him in the lawsuit by agreeing to pay the sum of $115,000 to DKW no later than March 13, 2002 (Exhibit J). The $115,000 to fund the settlement between the Debtor and DKW was paid out of the LANS sale proceeds that the Debtor had deposited into Anita Norwood's personal savings account on February 22, 2002. The Debtor made the payment to DKW on March 12, 2002. There is no evidence in the record to show that Anita Norwood ever had any liability to DKW for any amount.

After the Debtor entered into the settlement agreement with DKW, DKW substituted out of its representation of the Debtor in the pending litigation against him. The Debtor then retained Sherry Cataldo to represent him personally in the lawsuits against him.

In addition to paying $115,000 to DKW out of the $187,000 deposited into her personal account on February 22, 2002, Anita Norwood also transferred $75,000 from her personal savings account back to the joint checking account maintained by the Debtor and Anita Norwood at Comerica Bank four days later on February 26, 2002 (Exhibit P). That $75,000 was then used by the Debtor and his wife to pay various bills and household obligations described in the summary of activity in the joint checking account prepared by the Debtor (Exhibit P). There is no evidence in the record to show that any of the $187,000 that was deposited into Anita Norwood's personal savings account was ever used for any purpose other than to pay debts of the Debtor.

Although the Debtor continued to believe that there would be a way of resolving the financial problems of Golf Club, and that he would not be required to pay the indebtedness that he had personally

guaranteed to Textron or Great America Leasing, there was no resolution of the financial problems of Golf Club. On June 11, 2002, yet another lawsuit was filed against Golf Club (Exhibit H), this time by Golf Course Construction, Inc., which sought a judgment in the amount of $301,788.02 against Golf Club, the Debtor and other individuals. On September 16, 2002, the U.S. District Court for the Eastern District of Michigan entered a judgment in favor of Great America Leasing Corporation and against Golf Club, the Debtor, Yates and Solely, for $354,192.95 (Exhibit F). By this time, the financial situation of Golf Club had collapsed and, on September 24, 2002, Golf Club filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On October 3, 2002, a fifth lawsuit was filed against the Debtor and others by Bank One (Exhibit G) to recover the sum of $698,223.64 from the defendants as guarantors of the loans made by Bank One to LANS. On that same day, the Textron litigation proceeded to judgment. On October 3, 2002, the Livingston County Circuit Court entered a judgment in favor of Textron and against the Debtor, Yates and Solely, for $3,349,962 (Exhibit E).

In September and October, 2002, because of the substantial judgments entered against him, the Debtor for the first time considered filing bankruptcy and sought the advice of bankruptcy counsel. During this time frame, the Debtor also engaged in some additional transactions regarding his assets. On October 21, 2002, $12,000 was withdrawn from the joint checking account of the Debtor and his wife at Comerica and deposited into Anita Norwood's personal savings account (Exhibits P and Q). Neither the Debtor nor the Debtor's wife could remember who made the transfer or the reason for this transaction, but they did remember that Anita Norwood did not give the Debtor anything in exchange for this deposit. Both the Debtor and Anita Norwood recalled however, that out of this $12,000 deposit, Anita Norwood then paid $10,000 as an "earnest money deposit" for a residence that the Debtor and his wife purchased on

-10-

December 17, 2002 (Exhibit 12). Also, in November, 2002, the Debtor sold the Harley Davidson motorcycle for $16,000 and used the proceeds to pay his attorney, Sherry Cataldo.

Sometime in the fall of 2002, after obtaining its judgment against the Debtor, Great America Leasing attached certain assets, including the Mercedes which was eventually released by Great America Leasing in exchange for payment of $17,000. After this, the Debtor took two actions, each of which he testified were undertaken upon the advice of his bankruptcy attorney. First, sometime during November, 2002, the Debtor removed his name from the title of the Mercedes so that it was now in the name of Anita Norwood only. Around the same time, the Debtor also removed his name from a joint investment account that he and Anita Norwood owned and maintained at Paulson Investment Company, Inc. The account statement for October 31, 2002 (Exhibit O) was in both the names of the Debtor and Anita Norwood and indicated that it was a joint tenancy. That statement showed a balance in the account as of that date of $59,999.88. The account statement for November 28, 2002 showed a balance in the account as of that date of $66,527.88. The Debtor's name was no longer on the account statement on that date; now it was only in the name of Anita Norwood (Exhibit O). The Debtor testified that these actions were undertaken to keep the Paulson account and the Mercedes from being taken by the Debtor's creditors.

On February 24, 2003, the Debtor filed a Chapter 7 petition. In the statement of financial affairs that he filed with that petition (Exhibit A), the Debtor disclosed three transfers made during the year prior to the bankruptcy petition in answer to question number 10. One of those transfers was the sale of a motorcycle to a third party on February 16, 2003. The second transfer was the transfer of the Mercedes title to his wife, which he listed as having occurred in December, 2002. The final transfer was the sale by the Debtor and his wife of real property located on Rickham Street on August 14, 2002. Anita Norwood

-11-

owned this property after her prior marriage. She testified that she had transferred it to herself and the Debtor sometime after the two of them were married. Although the Debtor disclosed these three transfers in the statement of financial affairs, he did not disclose as transfers either the removal of his name from the Paulson account in November, 2002 or the withdrawal of the $12,000 from the joint account that was paid to Anita Norwood's personal savings account on October 21, 2002.

IV. Analysis

A.  Count I - Preferential Transfers under § 547

Count I of the Plaintiff's complaint seeks to recover three preferential transfers. According to the Plaintiff, preferential transfers were made by Debtor to his wife, Anita Norwood, when (i) the $12,000 was withdrawn from the joint checking account on October 21, 2002 and deposited into Anita Norwood's personal savings account; (ii) the Debtor's name was removed from the title to the Mercedes in November, 2002, leaving the title in Anita Norwood's name only; and (iii) the Debtor's name was removed from the Paulson account in November, 2002, leaving that account in Anita Norwood's name only.

Section 547(b) provides in pertinent part as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

>    (1) to or for the benefit of a creditor;
>    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>    (3) made while the debtor was insolvent;
>    (4) made–
>>        (A) on or within 90 days before the date of the filing of the petition;
>>        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

-12-

(5) that enables such creditor to receive more than such creditor would receive if–
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the
    extent provided by the provisions of this title.

11 U.S.C. § 547(b).

    "Transfer" is defined in § 101(54) of the Bankruptcy Code as "mean[ing] every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . . ." 11 U.S.C. § 101(54). If the three events described by the Plaintiff were transfers of the Debtor's property, the Plaintiff must then prove each element under § 547(b) in order to prevail. The first element under § 547(b)(1) is that such transfers were "to or for the benefit of a creditor." "Creditor" is defined in § 101(10) of the Bankruptcy Code as an "entity that has a claim against the debtor . . . ." "Claim" is defined in § 101(5)(A) as a "right to payment."

    The Plaintiff maintains that Anita Norwood was a creditor of the Debtor at the time these transfers were made. The Plaintiff bases this contention on the Debtor's statements in his deposition testimony. The Debtor testified in his deposition that he "felt" he owed his wife a debt related to the sale of the Rickham property. Anita Norwood had transferred the property over to herself and the Debtor as her husband and, eventually, the property was sold with $55,000 of the proceeds going to pay off various obligations of the Debtor. At trial, the Debtor explained that he "wanted to pay his wife something" because she had owned the Rickham property prior to the time that she married the Debtor in 1997, and he thought that she should benefit from the sale because "a husband should take care of his family." Anita Norwood testified that she was not owed any money by the Debtor at the time of these transfers. Anita Norwood's testimony

-13-

corroborated the Debtor's testimony that the Debtor thought that the proceeds from the sale of the property should be saved for Anita Norwood's children from her first marriage.

Although it is clear from the Debtor's testimony that he felt some sense of moral obligation to pay his wife on account of the circumstances, the Plaintiff did not meet his burden of proof to show that Anita Norwood was a creditor of the Debtor. The Debtor's subjective belief that he owed Anita Norwood a debt is not sufficient proof that Anita Norwood had a "right to payment" against the Debtor. Although the Debtor may have had a feeling or a sense that he wanted to pay something to his wife, there simply is insufficient evidence to prove that she was a creditor. Accordingly, the first element of § 547(b)(1) is not met because Anita Norwood is not a creditor. Therefore, the Plaintiff cannot recover on Count I of his complaint, which seeks the recovery of alleged preferential transfers.

B. Count III - Fraudulent Transfers under § 544 and Michigan Uniform Fraudulent Transfer Act

In Count III, the Plaintiff seeks to recover five alleged fraudulent transfers that took place on February 22, 2002. Although this is the last count in the Plaintiff's complaint, the Court will address this count next before addressing Count II, because Count III pertains entirely to transactions that occurred prior in time to the transactions that are the subject of Count II in the Plaintiff's complaint. The alleged fraudulent transfers that took place on February 22, 2002 that are the subject of Count III are as follows:

1. $187,000 deposited from the LANS sales proceeds in Anita Norwood's personal savings account at Comerica.

2. $40,587.38 paid to Bank One on a home equity loan on the Rickham property.

3. $15,754.74 paid to Bank One with respect to the Harley Davidson motorcycle.

4. $26,484.55 paid to Bank One with respect to the Mercedes.

-14-

5. $28,703.04 paid to Bank One with respect to the BMW.

Section 544 of the Bankruptcy Code gives a trustee power to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title . . . ." 11 U.S.C. § 544(b)(1). The "applicable law" upon which the Plaintiff relies is the Michigan Uniform Fraudulent Transfer Act, Mich. Comp. Laws Ann. §§ 566.31-.43 (West Supp. 2005). The statute has alternate definitions of a fraudulent transfer. Section 566.34 addresses actual fraud:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
> > (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> > (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Mich. Comp. Laws Ann. § 566.34(1). Section 566.34(2) lists several factors, known as "badges of fraud," to be used in determining actual intent under § 566.34(1)(a).

A companion provision under the Michigan statute addresses constructive fraud. Under § 566.35(1),

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mich. Comp. Laws Ann. § 566.35(1).

Under each provision, whether alleged as actual or constructive fraud, a threshold element in Count III of the Plaintiff's case is the existence of a "transfer." The Michigan Uniform Fraudulent Transfer Act defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Mich. Comp. Laws Ann. § 566.31(l).

The first alleged transfer in Count III is the deposit of $187,000 of proceeds from the sale of LANS into Anita Norwood's personal savings account. The testimony was uncontroverted that the purpose of placing those funds in that account was to provide "safe keeping" to enable the Debtor to set aside funds to address the DKW bill. The Plaintiff argued that keeping the money "safe" meant the Debtor intended to keep the funds hidden from creditors. The Debtor's testimony was contrary to Plaintiff's argument. Instead, the Debtor testified that his intent was more in the nature of reserving funds to pay the imminent bill from DKW and he needed to keep the funds safe from himself or Anita Norwood using them to pay other creditors. Looking to what in fact happened to those funds, the evidence showed that, on March 11, 2002, $115,000 was taken out of the savings account of Anita Norwood and paid to DKW on account of its claim against the Debtor. The Debtor testified that, although his name was not on Anita Norwood's account, he "had access to" the savings account. The $115,000 paid out of the LANS sales proceeds deposited in Anita Norwood's saving account was solely for the benefit of the Debtor, as there is no evidence in the record to show that Anita Norwood had any liability to DKW.

The Court finds that the use of Anita Norwood's savings account for the safe keeping of the $115,000 to pay to DKW did not constitute a transfer by the Debtor to Anita Norwood of these funds,

-16-

as the Debtor never parted with or disposed of these funds. Rather, the Debtor simply used Anita Norwood's account as a temporary earmarked account or conduit for the payment of these funds to one of his creditors, DKW.

Similarly, the balance of the $187,000 deposited into Anita Norwood's account was returned to the joint account that the Debtor and his wife maintained to pay their personal bills four days later. In her testimony, Anita Norwood accounted for all of those funds: they were indisputably utilized by the Debtor and his wife to pay their personal bills and household expenses. The Debtor testified that he had access to the funds in the savings account and Anita Norwood testified that during this time she was depositing her own pay check into their joint checking account. It is clear from the testimony of the Debtor and Anita Norwood that the Debtor had access to and maintained some control over the funds in the savings account as well as the joint account. The uncontroverted evidence shows that the Debtor did not intend to part with or dispose of the $187,000 by placing it in his wife's account rather than into the joint account that he maintained with his wife. To the contrary, all of the $187,000 deposited into Anita Norwood's account was used by the Debtor to pay obligations and debts for which the Debtor was responsible. The evidence demonstrates that the Debtor used the savings account of Anita Norwood solely for the purpose of serving as a conduit to pay his debts. The Court finds that there was no transfer of the $187,000 by the Debtor to Anita Norwood.

The second payment that the Plaintiff alleged to be a fraudulent transfer in Count III of the complaint is the $40,587 paid on account of the home equity loan on the Rickham property. Although it is true that the payment was a transfer to Bank One, that is not the transfer the Plaintiff seeks to recover. Instead, the Plaintiff seeks to recover this sum from Anita Norwood. However, the uncontroverted

-17-

testimony demonstrates that this payment also did not effectuate a transfer to Anita Norwood. The Debtor and his wife both testified that they sold the Rickham property and, on August 14, 2002, the Debtor and his wife deposited the sum of $55,000, representing the net sales proceeds, back into the joint account that they maintained together at Comerica Bank (Exhibit P). Once they sold the property, the Debtor and Anita Norwood put all of the net proceeds back into the joint account and used them to pay obligations of the Debtor. There is no evidence that any of that $55,000 was ever used to pay anything other than debts of the Debtor. Although it is true that the payment of the $40,587 on February 22, 2002 temporarily created equity in the jointly held real estate until it was sold on August 14, 2002 and the net proceeds were remitted back to the joint account, the Court finds that there was no transfer to Anita Norwood as the Debtor neither intended to nor did part with or dispose of the $40,587. The payment made by the Debtor on the home equity loan converted the form of the asset from funds to equity in real estate, but the Debtor did not part with or dispose of that equity. Rather, he retained it and, when it was converted back to proceeds upon the property's sale, used it to pay his debts.

Nor did the Debtor make a transfer to Anita Norwood of the $15,754.74 paid on February 22, 2002 with respect to the Harley Davidson motorcycle. This is the third fraudulent transfer alleged by the Plaintiff in Count III. It is true that the pay down of the loan on the Harley Davidson motorcycle temporarily had the effect of creating equity in the motorcycle for the title holders, the Debtor and his wife, but again, the Debtor never parted with or disposed of this asset or its value. The uncontroverted testimony was that the Harley Davidson motorcycle was sold in November, 2002 with all of the proceeds paid to the Debtor's attorney for application to an outstanding bill for services rendered by that attorney to the Debtor. In other words, all of the equity that was temporarily created in the Harley Davidson motorcycle by

-18-

payment of the outstanding loan against it on February 22, 2002 was unquestionably used by the Debtor to pay off the Debtor's debt. There never was a transfer to Anita Norwood in the sense of the Debtor ever parting with the value of the $15,754.74 that was paid to Bank One on February 22, 2002. Anita Norwood never received any benefit from the payment. When the Debtor and Anita Norwood sold the motorcycle, all of the proceeds went to pay the Debtor's debts. Under these circumstances, the Court concludes that there was no transfer to Anita Norwood on February 22, 2002 when the Debtor paid off the loan against the Harley Davidson motorcycle.

However, the analysis is somewhat different with respect to the fourth and fifth alleged transfers, consisting of the payoff of the note against the Mercedes and the payoff of the note against the BMW. The BMW was owned solely by Anita Norwood. There is no evidence that it was ever disposed of or that the value that was created by the payment of $28,703.04 was ever returned in any way to the Debtor. Unlike the situation with the Harley Davidson, the evidence did not show that the pay off of the indebtedness against the BMW was somehow a mere conduit for the Debtor to pay his debts. Rather, it appears that the Debtor parted with substantial value by way of this payment. Although it is true that the Debtor was personally responsible for the debt on the BMW until he paid it off, there was collateral to support the debt. Once he made the payment of $28,703.04, the lien on the BMW was extinguished and Anita Norwood owned it free and clear. That had the effect of transferring substantial value to Anita Norwood. The Court concludes that the sum of $28,703.04 that was paid to Bank One on February 22, 2002 was an indirect transfer to Anita Norwood.

The Court also finds that the payment of $26,484.55 to Bank One on February 22, 2002 with respect to the Mercedes effectuated a transfer to Anita Norwood. Like the BMW, there was no

subsequent disposition of the Mercedes that resulted in its proceeds being utilized to pay the Debtor's obligations. When the Debtor paid $26,484.55 to Bank One, it had the effect of creating equity in the Mercedes. Because the Mercedes was owned jointly by the Debtor and Anita Norwood, the consequence of this transfer was to create value for Anita Norwood in an amount equal to $13,242.27 (i.e., one half of the total payment made to Bank One).

The Plaintiff proved that there were two transfers to Anita Norwood consisting of the payments with respect to the Mercedes and the BMW that the Debtor made on February 22, 2002. The Plaintiff alleges in Count III that these transfers are recoverable under either § (a) or (b) (actual fraud) of Mich. Comp. Laws Ann. § 566.34(1), and under Mich. Comp. Laws Ann. § 566.35 (constructive fraud).

Section 566.34(1)(a) requires intent to defraud. To determine the Debtor's intent in making the transfers requires application of the factors identified in Mich. Comp. Laws Ann. § 566.34(2).[1]

---

[1] The badges of fraud in § 566.34(2) are as follows:

(a) The transfer or obligation was to an insider.
(b) The debtor retained possession or control of the property transferred after the transfer.
(c) The transfer or obligation was disclosed or concealed.
(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
(e) The transfer was of substantially all of the debtor's assets.
(f) The debtor absconded.
(g) The debtor removed or concealed assets.
(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

-20-

Several of the factors support a finding of intent to defraud. First, the two transfers themselves, although consisting of payments to Bank One, did each have the effect of transferring equity in the vehicles to Anita Norwood. As the Debtor's wife, Anita Norwood is an insider. Second, the payments were made by the Debtor after the Debtor had been sued by Textron and by Great America Leasing. Third, both the Debtor and his wife testified that there was no consideration provided by Anita Norwood to the Debtor in exchange for these payments. Fourth, the evidence shows that the Debtor was insolvent at the time of these payments. Under the Michigan Uniform Fraudulent Transfer Act, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Mich. Comp. Laws Ann. § 566.32(1). There is a presumption of insolvency if a debtor "is generally not paying his or her debts as they become due . . . ." Id. § 566.32(2).

Before considering the other factors pertaining to intent, it is worth examining the evidence that leads the Court to conclude that the Debtor was insolvent. The personal financial statement (Exhibit B) prepared and signed by the Debtor on September 21, 2001 appeared to show that the Debtor was solvent. The Debtor listed $1,320,000 in assets and $317,000 in liabilities. However, the Debtor admitted that the personal financial statement contained errors and was incomplete. The $1,000,000 in cash value of the life insurance should not have been included as an asset. On the liability side, the Debtor already knew at that time of his liability to Textron. He had signed an "absolute and unconditional[ ]" guarantee for the "full and timely payment and performance" of Golf Club's obligations to Textron (Exhibit S), and testified that

---

Mich. Comp. Laws Ann. § 566.34(2).

he had received a letter dated August 21, 2001 from Textron advising him of Golf Club's default (Exhibit U). By that time, Golf Club had missed the payment due on August 1, 2001. The amount of the monthly payment on the Textron note is not in the record. Textron warned the Debtor that it would charge Golf Club the default interest rate if the payment was not cured by August 31, 2001. At some point between the August 21, 2001 default letter and Textron filing suit on December 13, 2001, Textron accelerated the entire indebtedness of over $3 million. The Debtor testified that he knew that Golf Club was unable to pay that indebtedness and was experiencing serious financial difficulties. The Debtor further testified that Golf Club's financial condition was the reason he stopped receiving a salary. Exhibit P shows that the Debtor made the last deposit described as "Wages & Salary" from Golf Club into the joint checking account on October 1, 2001. (Exhibit P at 8.) In addition, Golf Club stopped making the payments on the Debtor's Escalade. The Debtor took over those payments in November, 2001. (Exhibit P at 10.)

A credit report further supports a conclusion that the Debtor understated his liabilities on the personal financial statement. The credit report (Exhibit T) showed that the Debtor had substantial liabilities, mostly credit card balances, as of November 15, 2001. This was less than two months after the Debtor prepared the personal financial statement. If anything, the Debtor's financial situation had deteriorated since the September, 2001 personal financial statement because he had stopped receiving a salary from Golf Club and assumed the payments for the Escalade. The Debtor's amended schedules of assets and liabilities and statement of financial affairs (Exhibit A) filed in the bankruptcy case on May 23, 2003 reflect that there were no substantial changes in the Debtor's financial condition since the date of the personal financial statement.

As of the fall of 2001, it was clear that some portion of the Debtor's contingent liability through his

guaranty of Golf Club's payment on the Textron note had become fixed. In determining the insolvency of a debtor, contingent liabilities should be discounted "by the probability that the contingency will occur and the liability become real." In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir. 1988); see also Oakes v. Spalding (In re Oakes), No. 92-3935, 1993 WL 339725 at *3 (6th Cir. Sept. 3, 1993) (following In re Xonics and reasoning that "[t]o include contingent liabilities at full value would often render an entity insolvent as of the date the obligations were assumed, which would cause an 'absurd' result").[2] "To determine the value of a contingent liability, the court should multiply the total debt guaranteed by the probability that the debtor will be required to fulfill the guarantee." Covey v. Commercial Nat'l Bank, 960 F.2d 657, 659 (7th Cir. 1992), *quoted in* In re Oakes, 1993 WL 339725 at *3.

In this case, the amount of Golf Club's required payment to Textron is unknown. The Debtor testified that he was only one of three guarantors, but the collectibility of the other guarantors is unknown. According to the Debtor's testimony, up to the time the LANS sale closed, Yates had been actively seeking alternative financing or additional investors. Draft contracts had been circulated, but never finalized. Yates was discussing possible solutions with not only Textron, but Great America Leasing and Bank One as well. The Debtor also stated that he did not believe that he had any liability until Textron foreclosed on the debt, and that the value of Golf Club would more than cover any debt to Textron. According to Textron's complaint, its note was secured by a mortgage on the real property and on Golf Club's personal

---

[2] There are no published cases by a Michigan court addressing how to value a contingent liability for purposes of determining insolvency. However, the definitions of insolvency under the Michigan Uniform Fraudulent Transfer Act and the Bankruptcy Code are virtually identical. The "absurd" result that would be reached in not taking into account the probability that a contingency is the same under both federal bankruptcy law and Michigan law.

-23-

property and fixtures. There is no evidence in the record of the value of the real property or of Golf Club. Textron valued the personal property and fixtures at $500,000.

The incomplete record in this case makes it difficult to quantify the amount that the Debtor's liability to Textron should be discounted, particularly during the time before Textron filed its complaint. However, after December 13, 2001, the probability that the Debtor would have a substantial liability became much higher. By then, Textron had accelerated the entire amount of the indebtedness. The Debtor testified that at no time did he have the ability to pay the $3.3 million debt to Textron or the debts to Great America Leasing or Bank One. In addition, even though Yates worked diligently to bring in additional investors up to the February, 2002 closing on the sale of LANS, the Debtor stated that "nothing would ever cure the problem of the golf course." Meanwhile, Great America Leasing filed suit on February 1, 2002, asking for approximately $350,000 against the Debtor and the other guarantors. The damages were largely for unpaid rental payments. As with the Textron guaranty, the Debtor guaranteed payment, not merely collection. Therefore, as soon as Golf Club defaulted on its payments, the Debtor's liability became certain, subject only to payment by some other party. That did not happen and the Debtor acknowledged it was very unlikely to happen, either with respect to Textron or Great America Leasing.

Another major contingent debt was the debt for attorney fees to DKW. DKW filed suit on February 26, 2002, shortly after the February 22, 2002 transactions. The Debtor testified that the reason he deposited the $115,000 into Anita Norwood's savings account was to set funds aside to pay this debt. Therefore, at the time the Debtor paid off the Mercedes and the BMW, the probability that the Debtor would be liable for at least part of the DKW fees was high.

Although the Court cannot ascertain with any degree of precision a specific multiplier to discount

the Debtor's liability on the guarantees, the Court finds a substantial likelihood that the Debtor's contingent liabilities were sufficiently fixed, such that the Debtor's liabilities did exceed his assets on February 22, 2002. The Court reaches this conclusion even after adjusting the Debtor's assets listed on his personal financial statement to include omitted assets. Based upon the personal financial statement, the credit report, the Debtor's testimony, and the Debtor's schedules of assets and liabilities filed in the bankruptcy case, the Court finds that the Debtor was insolvent on February 22, 2002, the date that the two transfers were made.

Returning to the badges of fraud, several of the statutory factors do not support a finding of intent to defraud. First, there is no evidence in the record to indicate that the Debtor concealed the payments with respect to the Mercedes or the BMW. Second, the vehicles did not comprise substantially all of the Debtor's assets. Third, there is no evidence that the Debtor absconded in any way. Fourth, there is no evidence to suggest that the Debtor removed or concealed assets. Fifth, there is no evidence in the record, one way or the other, regarding whether the Debtor retained possession or control of the two vehicles after he made the payments. Sixth, the transfers did not occur shortly before or after a substantial debt was incurred  Finally, this was not a case where the Debtor transferred essential assets of a business or a lienor who transferred the assets to an insider of the Debtor.

On balance, after considering all of the factors listed in Mich. Comp. Laws Ann. § 566.34(2), the Court concludes that the Debtor did not make the payments on the Mercedes and the BMW with actual intent to hinder, delay or defraud any of the Debtor's creditors. Although some of the factors set forth in Mich. Comp. Laws Ann. § 566.34(2) are present in this case, the Court is not persuaded that the Debtor intended to defraud his creditors by making these two payments. First, the Debtor was personally responsible to Bank One for the amounts that he paid. He paid these amounts on the same day that he paid

-25-

other debts that he was responsible for as well. In some cases, those payments had the effect of creating equity in assets owned by him or his wife. But the testimony showed that several of the assets that were paid off were subsequently sold with the proceeds being used to pay down the liabilities of the Debtor. Second, the Debtor did not dispose of substantially all of his assets. Third, he took no action to conceal the payments that he made. Fourth, the Debtor's and Anita Norwood's testimony was that the Debtor used proceeds from the sale of LANS to pay his bills. The testimony that the Debtor used those proceeds to pay his bills was credible. Therefore, the Court concludes that the two transfers consisting of the payments made with respect to the Mercedes and BMW obligations did not create fraudulent transfers under Mich. Comp. Laws Ann. § 566.34(1)(a).

Under the alternate actual fraud provision of § 566.34(1)(b), the transfers are still considered fraudulent if the Debtor did not receive "a reasonably equivalent value in exchange for the transfer[s]" and the Debtor was either "engaged or about to engage in a business or a transaction for which the remaining assets of the [D]ebtor were unreasonably small" or the Debtor "[i]ntended to incur, or believed or reasonably should have believed that he . . . would incur, debts beyond his . . . ability to pay as they became due." Mich. Comp. Laws Ann. § 566.34(1)(b). Although the Debtor did not receive a reasonably equivalent value for the payments with respect to the Mercedes and BMW, there is no evidence in the record to show that the Debtor was engaged or about to engage in a business for which his remaining assets were unreasonably small. Nor is there any evidence in the record to prove that the Debtor intended to incur or believed that he would incur debts beyond his ability to pay at the time that he made these two payments. Accordingly, the transfers were not fraudulent under the alternative actual fraud provision of § 566.34(1)(b).

-26-

Under Mich. Comp. Laws Ann. § 566.35(1), the transfers are still considered constructively fraudulent as to creditors whose claims arose before the transfers were made if the Debtor made the transfers without receiving reasonably equivalent value in exchange for the transfers and the Debtor was insolvent at that time. The payments with respect to the Mercedes and the BMW were transfers. These transfers, although made directly to Bank One, indirectly caused Anita Norwood to receive the value and the benefit of these payments because she owned the title to the BMW and was a joint owner of the Mercedes. Anita Norwood did not provide any value to the Debtor in exchange for these transfers let alone a reasonably equivalent value. Further, the Debtor was insolvent at the time that these transfers were made. Therefore, the Court concludes that the payments by the Debtor on the Mercedes and the BMW were fraudulent transfers to Anita Norwood under Mich. Comp. Laws Ann. § 566.35(1). See Lewis v. Harlin (In re Harlin), 321 B.R. 836, 840-43 (E.D. Mich. 2005) (surveying "a long line of Michigan cases" holding that one spouse retiring a debt, while insolvent, on property held jointly with the other spouse is fraudulent under the Michigan Uniform Fraudulent Transfer Act). The transfer to Anita Norwood that is recoverable under that statute on account of the BMW payment is $28,703.04. The transfer to Anita Norwood that is recoverable on account of the Mercedes payment is $13,242.27 which represents one half of the amount of the payment that was made. The Court rejects the Plaintiff's assertion that either the Debtor or Anita Norwood should somehow be responsible for paying the other half of the payment back to the estate. To the extent that the Debtor created value or equity in his own name by this payment, this payment is not a fraudulent transfer to Anita Norwood that can be recovered by the Plaintiff, nor is it a "transfer" by the Debtor to himself that is somehow recoverable.

In each count of his complaint, the Plaintiff asked that the transfers made by the Debtor to Anita

-27-

Norwood be avoided. The prayer for relief asks that the transfers be set aside as well as the entry of a money judgment against the Debtor and Anita Norwood "jointly and severally." Section 550(a) of the Bankruptcy Code provides for either recovery of the property transferred or the value of the property. The joint final pre-trial order lists the Plaintiff's damages for the transfer of the Mercedes and the BMW in terms of a dollar amount, and does not request return of the transferred property. By local rule, the joint final pre-trial order, once signed by the Court, "becomes an order of the Court, superseding the pleadings and governing the course of trial unless modified by further order." L.B.R. 7016-1(a) (E.D.M.). By his agreement to the terms of the joint final pre-trial order, the Court concludes that the Plaintiff has opted for a money judgment instead of recovery of the vehicles. Section 550(a) also allows for recovery against the initial transferee, and any immediate or mediate transferee. However, the Plaintiff has cited no authority supporting his request for recovery against the Debtor as the transferor of a fraudulent transfer. Therefore, any money judgment under Count III will only be rendered against Anita Norwood individually.

In sum, the Court concludes that under Count III the two payments with respect to the Mercedes and the BMW did effect fraudulent transfers by the Debtor to his wife under Mich. Comp. Laws Ann. § 566.35(1) and can be recovered by the Plaintiff against Anita Norwood in the following amounts:

$13,242.27 with respect to the Mercedes

$28,703.04 with respect to the BMW

$41,945.31 total

C. Count II - Fraudulent Conveyances under § 548 and § 550

The Bankruptcy Code gives the Plaintiff, as the chapter 7 Trustee in the case, the power to avoid any transfer of an interest of the debtor in property, or any obligation incurred by the

-28-

debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

      (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

      (B)      (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

            (ii)      (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

                  (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

                  (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1). "[T]o the extent that a transfer is avoided," § 550 allows the Plaintiff to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . " the initial, immediate or mediate transferee. 11 U.S.C. § 550(a).

In Count II, the Plaintiff seeks to set aside fraudulent transfers made within one year of February 24, 2003, the date the Debtor filed his bankruptcy petition. The alleged transfers that fall within this time frame consist of the following:

1.      The withdrawal of $12,000 out of the joint checking account and its deposit into the personal savings account of Anita Norwood on October 21, 2002.

2.      The removal by the Debtor of his name from the title of the Mercedes in November, 2002.

3.      The removal by the Debtor of his name from the Paulson joint investment account in November, 2002.

As with § 544 and Count III, the first requirement under § 548 is that there was a transfer of an

interest of the Debtor in property. Of the $12,000 taken out of the joint account and put into Anita

Norwood's account, Anita Norwood testified without contradiction that $10,000 of this sum was then used

to make the down payment on a residence purchased by the Debtor and his wife after they sold the

Rickham residence. As noted above under the analysis for Count III, the testimony of the Debtor and

Anita Norwood showed that they used her savings account as a temporary joint savings account. The

Debtor had access to the savings account and maintained some control over the disposition of funds

deposited into that account. The funds that were taken out of the joint account were then utilized to

purchase an interest in a jointly held asset consisting of the down payment on the real estate. There is no

evidence that the Debtor ever parted with or disposed of his interest in these funds. Although the funds

were moved from one bank account, which was maintained in the Debtor's name and his wife's name, to

an account bearing only her name, the Debtor still retained control over his interest in these funds and they

were used to purchase an asset owned by the Debtor and his wife. The Court is persuaded that the Debtor

never intended to part with or dispose of these funds and did not transfer them.

On the other hand, the Court finds that the Debtor did transfer his interest in the Mercedes and in

the Paulson account to his wife. Both assets were jointly titled in the names of the Debtor and Anita

Norwood. By removing his name from the title to these assets, the Debtor parted with his interest in these

assets. These actions constitute transfers under the definition in the Bankruptcy Code in § 101(54).

The next issue is intent. At the time these actions were taken, there were at least two creditors that

held substantial judgments against the Debtor. Both Textron and Great America Leasing had already

obtained a judgment. In fact, Great America Leasing had already attached some of the assets of the

Debtor in an attempt to collect on its judgment, one of those assets being the Mercedes. The Debtor

-30-

testified without contradiction that, on the advice of his attorney, he took his name off the Mercedes title and the Paulson account essentially to keep these assets away from his creditors. This is an admission of actual intent to hinder, delay or defraud the Debtor's creditors. Although the Court was impressed with the Debtor's candor and credibility in his testimony, nevertheless, the Court concludes that the Debtor did transfer his interest in the Mercedes and in the Paulson account to his wife, and that these transfers are fraudulent transfers that are recoverable under § 548 of the Bankruptcy Code.

The Paulson account had a balance of $59,998.88 when the Debtor removed his name from the account. The parties stipulated in the joint final pre-trial order that the Debtor "transferred $29,999.94, or half of the value of [the account] worth $59,999.88 . . . to Anita Norwood." Anita Norwood testified that she used $25,000 of those funds to pay the down payment on the family home on December 17, 2002. However, there is no evidence that the Debtor and Anita Norwood jointly used the Paulson account like Anita Norwood's savings account that would support a finding that the Debtor did not relinquish control over his share of the account. In addition, to consider Anita Norwood's subsequent use of some of the funds would require the Court to ignore the Debtor's plain admission that by taking his name off of the account, he intended to hinder or delay his creditors. It is enough that, at time of the transfer, the Debtor had the requisite fraudulent intent under § 548(a)(1)(A).

Likewise, the transfer of title to the Mercedes in November, 2002 also constituted a fraudulent transfer. The only evidence put into the record of the value of the Mercedes at that time was a statement contained in an e-mail dated December 11, 2002 (Exhibit 9), introduced into evidence by the Debtor, which indicates that the Blue Book value of the Mercedes at that time was $19,000. The Debtor's transfer of the title had the effect of conveying his one half interest in the Mercedes to his wife, or the equivalent of

a transfer of $9,500 of value. This is a separate and distinct transfer from the payment to Bank One in February, 2002, which paid off the loan on the Mercedes. The earlier transfer acted to create equity in the vehicle for the benefit of both the Debtor and Anita Norwood by discharging the security interest. The transfer of title effected a second transfer, this time of the Debtor's remaining interest in the vehicle. Accordingly, the Plaintiff may recover for both transfers. In sum, the Court concludes that under Count II, the Plaintiff is entitled to a judgment against Anita Norwood in the following amounts:

$29,999.94    representing one-half of the value of the Paulson account

$ 9,500.00    representing one-half of the value of the Mercedes

$39,499.94    total

### V. Conclusion

Both the Debtor and Anita Norwood testified credibly and were forthright in their explanations regarding the various transactions that form the subject matter of the Plaintiff's complaint. There was no evidence introduced to indicate that Anita Norwood in any way intended to act to the detriment of the Debtor's creditors. However, the evidence showed that Anita Norwood was the recipient of certain transfers of property by the Debtor that were fraudulent as to the Debtor's creditors and are therefore recoverable by the Plaintiff for the benefit of such creditors. Accordingly, the Court will award a judgment to the Plaintiff and against Anita Norwood in an amount equal to the value of such transfers. With respect to Count I, the Court awards a judgment of no cause of action in favor of the Defendants and against the Plaintiff. With respect to Count III, the Court awards judgment to the Plaintiff and against Anita Norwood only in the amount of $41,945.31. With respect to Count II, the Court awards judgment to the Plaintiff and against Anita Norwood only in the amount of $39,499.94. The total judgment against Anita Norwood

will be $81,445.25. The complaint is dismissed with prejudice as to the Debtor. The Court will enter a judgment consistent with this opinion.

Not for publication.

Entered: November 01, 2005

                                    /s/ Phillip J. Shefferly
                                    Phillip J. Shefferly
                                    United States Bankruptcy Judge